**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

DIONESE DEAN,                               )
                                            )
      Plaintiff,                     )
                                            )
v.                                          )     Case No.  4:16-CV-43-DDN
                                            )
NANCY A.  BERRYHILL[1],                     )
Acting Commissioner of Social Security,     )
                                            )
      Defendant.                     )

## MEMORANDUM

This action is before the court for judicial review of the final decision of the Commissioner of Social Security that plaintiff Dionese Dean is not disabled under Title II or Title XVI of the Social Security Act and is thus not entitled to disability insurance benefits ("DIB"), 42 U.S.C. §§ 401 et seq.,  nor supplemental security income ("SSI"). 42 U.S.C. §§ 1381-1383(f).   For the reasons set forth below, the decision of the Commissioner is affirmed.

## I.    BACKGROUND

Plaintiff applied for DIB and SSI in August 2012, ultimately alleging a disability onset date of March 15, 2013.  (Tr. 131-43, 167).  Her initial claims were denied on November 1, 2012.  (Tr. 71-75).  Plaintiff filed a timely written request for a hearing on November 9, 2012.  (Tr. 78).  She testified before an administrative law judge ("ALJ") on April 22, 2014.  (Tr. 24).  On August 27, 2014, the ALJ determined plaintiff was not disabled.  (Tr. 9-19).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), Ms. Berryhill is hereby substituted for Carolyn W. Colvin in her official capacity as the defendant in this action.  42 U.S.C. § 405(g) (last sentence).

The ALJ decided that while plaintiff has severe impairments and is unable to perform her past relevant work ("PRW"), considering her residual functional capacity ("RFC"), there are jobs in significant numbers in the local and national economies plaintiff could perform. (Tr. 12-19). Plaintiff filed a timely request for review on October 1, 2014, which the Appeals Council denied on December 8, 2015. (Tr. 1-7). The decision of the ALJ therefore stands as the final decision of the Commissioner of Social Security. Plaintiff filed for judicial review of this decision on January 12, 2016, arguing that it is not supported by substantial evidence.

A.    **Medical Record and VE Information**

Plaintiff was born on March 29, 1984. (Tr. 67-68). She first complained of low back pain at Grace Hill Health Center on August 20, 2012. (Tr. 242). At the time, she described the back pain as an ache that was aggravated by daily activities, lying and resting, running, sitting, and standing. (Tr. 242). While plaintiff claimed that the pain had been worsening the past three months, the pain was relieved by constant movement. (Tr. 242). She weighed 174 lbs. at the time with a body mass index ("BMI") of 28.95. (*Id.*). Nurse Practitioner Brook Strickland prescribed Flexeril for plaintiff's back muscle spasms and Naprosyn for her pain and inflammation. (Tr. 243). Ms. Strickland ordered an x-ray of plaintiff's back, which showed a mild curvature of the lumbar spine. (Tr. 243, 408). Plaintiff was diagnosed with lumbago with sciatica. (Tr. 408).

On September 13, 2012, plaintiff sought treatment at Grace Hill for lower back pain. (Tr. 290). She was referred for a CT scan with contrast of her lumbar spine. (Tr. 292-93).

On November 15, 2012, Ms. Strickland of Grace Hill again saw plaintiff for low back pain, gastroesophageal reflux disease ("GERD"), allergies, and dyspnea. (Tr. 294). Plaintiff was again diagnosed with lumbago with sciatica, for which she was still waiting for a CT scan. (Tr. 294-96). Plaintiff was instructed to continue taking Gabapentin, which she reported as relieving her symptoms; Naproxen; and an increased dosage of Flexeril. (Tr. 294-96). She reported that the pain was an ache and throbbing feeling and

was aggravated by sitting and standing. (Tr. 294). For GERD, plaintiff was instructed to take Ranitidine, and for the allergies Claritin. (Tr. 296). Lastly, plaintiff's Advair prescription was decreased, but she was instructed to continue using it daily and to start Albuterol as a rescue inhaler. (*Id.*). At the time of this visit, plaintiff weighed 209 lbs. and had a BMI of 34.78. (Tr. 295).

On February 5, 2013, plaintiff returned to Grace Hill for back pain, GERD, asthma, allergies, tachycardia, and hypertension. (Tr. 303-05). Plaintiff was instructed to continue the same medications for the GERD and lumbago with sciatica. For plaintiff's asthma, she was instructed to continue to use Advair and use the Albuterol inhaler once a day. (Tr. 305). Ms. Strickland referred plaintiff to an ears, nose, and throat doctor, as the Claritin was not helping plaintiff with her allergies. Plaintiff was prescribed hydrochlorothiazide ("HCTZ") for the swelling of her feet and legs (edema) and Metoprolol for her tachycardia. (*Id.*). At the time of this visit, plaintiff weighed 231.4 lbs. and had a BMI of 38.50. (Tr. 304). Ms. Strickland set a goal for plaintiff to abide by the DASH diet.[2] (Tr. 302).

On February 7, 2013, plaintiff visited an orthopedic doctor on referral from Ms. Strickland. (Tr. 309). The orthopedic doctor reported both that plaintiff had noticed "significant improvement in pain with Gabapentin" while also claiming that she had experienced "worsening pain over last 6 months." (Tr. 310). Plaintiff was again seen at Grace Hill on February 20, 2013, for hypertension, tachycardia, lumbago with sciatica, and a vitamin D deficiency. (Tr. 314). Ms. Strickland prescribed the same treatments, except she increased the Gabapentin and educated plaintiff on her vitamin D deficiency. (Tr. 310). At this time Ms. Strickland specifically noted plaintiff showed no evidence of depression. (Tr. 317).

On April 3, 2013, Joseph Williams, M.D., of St. Louis Connect Care recommended plaintiff take Cymbalta for a month or two and return for a follow-up. (Tr.

---

[2] DASH (acronym for Dietary Approaches to Stop Hypertension) diet is a program of healthful eating. http://www.webmd.com/hypertension-high-blood-pressure/guide/dash-diet#1 (last viewed on March 15, 2017).

3

404-05). Additionally, he noted there were no obvious abnormalities in her back visible in an x-ray, but he recommended she obtain copies of her MRI and CAT scans. (Tr. 404).

On April 10, 2013, plaintiff was seen at Grace Hill by Vani Pachalla, M.D., for hypertension, edema, and back pain. (Tr. 319-20). Plaintiff's instructions were to continue her medications as prescribed, increase her activity level, and continue with the DASH diet as a goal. (Tr. 319).

On April 24, 2013, plaintiff was seen at St. Louis Connect Care, where she had a follow-up to review the MRI of her back. At the time, her BMI was 45.4, which Dr. Williams noted met the Federal Government Standards for morbid obesity. (Tr. 407). Dr. Williams opined that "there is nothing on her MRI or [her] physical examination that would account for her back pain." (Tr. 407). In order for plaintiff to relieve her back pain, Dr. Williams "recommended a diet and exercise and doing a job where she does something 8 hours a day instead of sitting around and eating." (Tr. 407).

On May 13, 2013, plaintiff went to Missouri Baptist Medical Center with complaints of a rapid heartbeat and chest pain. (Tr. 270). She rated her pain as 7/10 but was observed giggling and joking with her husband and the nurse while being examined. (Tr. 280-81). Tests administered that day did not reveal an official diagnosis, but it was noted that plaintiff had tachycardia unspecific and chest pain atypical. (Tr. 279).

On May 20, 2013, at a follow-up with Grace Hill, plaintiff was referred to both a cardiologist and a nutrition counselor by Nurse Practitioner Judith Gallagher, with tachycardia and weight gain listed as assessments. (Tr. 324-26). At this visit, plaintiff weighed 249 lbs. and her BMI was 41.53. (Tr. 327).

On August 28, 2013, at a follow-up at Grace Hill, plaintiff again complained of hypertension, allergies, asthma, GERD and back pain. (Tr. 333). David Richards, M.D., did not change any medication. (Tr. 334-35). Plaintiff weighed 260.80 and had a BMI of 43.39. (Tr. 334). On September 12, 2013, Dr. Richards restricted plaintiff's permitted activity to walking or standing only occasionally and to alternating between sitting and standing due to the increase in edema in her legs. (Tr. 345). Specifically, Dr. Richards

noted plaintiff "should not stand for long periods of time" and "may require frequent sit down periods due to increase[d] edema in legs." (Tr. 346).

On October 17, 2013, plaintiff was referred to Washington University in St. Louis' Multidisciplinary Sleep Medicine Center for a sleep study, due to her snoring and difficulty sleeping. (Tr. 396). Plaintiff was evaluated and the suggested potential treatments for both restless leg syndrome and obstructive sleep apnea were "positive airway pressure, oral prosthesis, surgery, Provent adhesive nasal valves, and weight loss." (Tr. 398). Additionally, it was noted that the insomnia was psychophysiological, "likely triggered by prior shift work and caregiver role in her mother's recent illness." (Tr. 398).

On December 2, 2013, plaintiff returned to Grace Hill with severe back pain. (Tr. 350-51). Plaintiff then weighed 263.4 lbs. and had a BMI of 43.83. (Tr. 362). On December 31, 2013, Dr. Richards saw plaintiff at Grace Hill for a follow-up on her severe back pain. (Tr. 368). Dr. Richards kept all of plaintiff's medication the same, including the goal of the DASH diet, but also added the goal of losing 75 lbs. by the upcoming summer. (Tr. 368-71). At this appointment, plaintiff weighed 268.8 lbs. and had a BMI of 44.69. (Tr. 370).

On January 7, 2014, plaintiff was seen for a comprehensive eye exam after complaining of gradually worsening blurry vision in both eyes. (Tr. 377). Plaintiff was given a new eye glasses prescription as well as instructed to take out her contacts nightly to clean them instead of wearing them when she slept, as this was likely the cause of her corneal scars that seemed to cause her blurry vision. (Tr. 381).

On January 8, 2014, plaintiff was seen at Washington University in St. Louis School of Medicine's Cardiovascular Division. (Tr. 399). Plaintiff was diagnosed with morbid obesity, hypertension, asthma, possible obstructive sleep apnea, physical deconditioning, probable diastolic congestive heart failure, and atypical chest pain. (Tr. 399). Plaintiff was advised to exercise lightly daily and to lose weight. (Tr. 400, 403). At this time, plaintiff weighed 264 lbs. (Tr. 400).

On July 20, 2014, VE Robin A. Cook, Ph.D., CRC submitted written answers to a written questionnaire. (Tr. 217-25). In this document the ALJ described this hypothetical person:

> 7. Assume a hypothetical individual who was born on March 29, 1984, has at least a high school education and is able to communicate in English as defined in 20 CFR 404.1564 and 416.964, and has work experience as described in your response to Question #6 [,which listed four jobs]. Assume further that this individual has the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(c) and 416.967(c) except she can sit for approximately 15 minutes at a time before standing briefly to reposition before sitting back down. She would be able to remain on task while repositioning.

(Tr. 224).[3]

Cook stated that a hypothetical individual with plaintiff's age, education, experience, and RFC would not be able to perform plaintiff's previous relevant work. (Tr. 224-25). When asked if there are jobs in the national economy this hypothetical individual could perform, the VE replied "yes" and listed these jobs as Final Assembler, Semiconductor Bonder, and Taper. (Tr. 225).

**B.    ALJ Hearing**

On April 22, 2014, plaintiff appeared and testified before an ALJ. (Tr. 24-54). Plaintiff testified that her current weight was 253 lbs. but her normal weight was 150 lbs., and she was unsure why she had gained such a significant amount of weight. (Tr. 30). She stopped working as a home healthcare assistant in March 2013 because her assistance was no longer needed. (Tr. 31). Previously, plaintiff had worked as a front desk agent, pool attendant, beer vendor, runner at the ballpark, bra salesperson, and a sign team member at a department store. (Tr. 31-33). Plaintiff testified she is unable to work now because she "can't stand or sit for a long period of time" due to severe swelling in her lower extremities. (Tr. 33). She is unable to sit for more than 15 minutes at a time

---

[3] This is the RFC the ALJ ultimately found for plaintiff. (Tr. 15).

because her "legs begin to go numb;" so, she has "to wiggle [her] legs often so they don't hurt." (Tr. 33).

Plaintiff testified she was seeing doctors for primary care, cardiology, sleep problems, and allergies. (Tr. 33-34). She additionally testified that due to the "weather changing," she had been using her albuterol inhaler "almost once a day", but it "help[ed] [her] catch [her] breath so [she] can breathe regularly." (Tr. 43). The albuterol inhaler causes shakiness as a side effect, which typically takes about five to ten minutes to go away. (Tr. 43).

Plaintiff testified that on a typical day her girlfriend helps her out of bed because she has trouble doing so herself. (Tr. 44). Plaintiff is able to maintain a normal morning hygienic routine before helping her son with breakfast. (Tr. 44). She then does as much cleaning as she can on her own, such as "making the bed, vacuum[ing] the floor, [and] sweeping the floor", but "once that becomes too extreme, [she has] to sit down and take a rest." (Tr. 44).

Plaintiff takes her medication three times a day. (Tr. 44). When she experiences pain throughout the day, she "[tries her] best to grin and bear it." (Tr. 44). In order to best circulate the fluids in her legs that lead to edema, plaintiff tries to keep her legs elevated for fifteen minutes and then stand up for fifteen minutes. (Tr. 46). However, even doing this throughout the day only has some effect on minimizing the swelling of her lower extremities and at times her feet swell to the point that she is unable to put on shoes. (Tr. 45, 47). At night, she does her best to keep her legs elevated by putting a pillow under them, but doing so at times causes pain in her lower back. (Tr. 45-46). Due to a combination of her insomnia, body aches, and restless leg syndrome, plaintiff typically sleeps from approximately 3:00 a.m. to 8:00 a.m. (Tr. 48).

Additionally, while plaintiff considers herself "a fairly independent person," she becomes "very, very depressed" when she can't do things for herself or her son. (Tr. 48). When she takes her depression medication regularly, it relieves her depressive symptoms, except for occasional crying spells. (Tr. 48-50). Plaintiff also testified she takes Cymbalta for back pain, but it does not relieve that pain. (Tr. 49). There are days due to

her back pain that she does not "have the will to get up because [her] back just hurts that bad." (Tr. 51).

Plaintiff testified her appetite is inconsistent, but she is not sure why that is the case. (Tr. 50). She claims she "kind of like stopped eating" due to the doctors advising her to lose weight and while the doctors "think [she] just sit[s] around and eat[s] all day," "that's not the case." (Tr. 50). She eats "at least once or twice a day" but then at times "purposefully dehydrates" herself to reduce her extremities' swelling and thus her discomfort. (Tr. 50-51).

There are a few side effects to her medications, including drowsiness, avoiding direct sunlight, and taking her medication with food to avoid an upset stomach. (Tr. 51).

## C.     ALJ's Decision

On August 27, 2014, the ALJ issued a decision that plaintiff was not disabled under the Act. (Tr. 9-19). The ALJ found that plaintiff met the DIB insured status through December 31, 2017. (Tr. 14). At Step One, she found that plaintiff has not engaged in any substantial gainful activity ("SGA") since the alleged onset date of March 15, 2013. (Tr. 14). At Step Two, the ALJ found that plaintiff suffers from the following severe impairments: asthma, arthritis, diastolic congestive heart failure, and morbid obesity. (Tr. 14).[4] At Step Three, the ALJ found that plaintiff does not have an impairment or a combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15).

---

[4] The ALJ determined the following impairments plaintiff alleged to suffer were nonsevere because they are controlled with medication: hypertension, GERD, and allergic rhinitis. (Tr. 14). The ALJ determined the other impairments plaintiff alleged to suffer from, including obstructive sleep apnea and depression, are not medically determinable impairments for plaintiff because she has not had a sleep test, which is required to diagnose obstructive sleep apnea, and because a state agency consultant determined that plaintiff does not have a medically determinable mental impairment. (Tr. 15, 65).

At Step Four, the ALJ determined plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). An exception to that determination is that plaintiff can sit for only approximately 15 minutes at a time before standing briefly to reposition herself before sitting back down, but she can remain on task while doing so. (Tr. 15). Using this RFC and VE information, the ALJ found at Step Five that while plaintiff is unable to perform any of her PRW, there are jobs that exist in significant numbers in the local and national economies that she can perform. (Tr. 18). Therefore, the ALJ concluded that plaintiff is not disabled. (Tr. 18-19).

In coming to this conclusion, the ALJ determined that while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms were not substantiated by objective medical evidence. (Tr. 16). Thus, the ALJ had to make a finding regarding the credibility of plaintiff's statements based on the entire record. SSR 96-7P.[5] Plaintiff claimed she was unable to work due to a history of osteoarthritis in her lumbar spine, morbid obesity, and edema that hinders her ability to sit and stand for extended periods of time, which would prevent her from sustaining a job that required her to work forty hours per week. (Tr. 16).

---

[5] While this SSR was rescinded by SSR 16-3p on March 16, 2016, it was still in force at the time of the ALJ's decision in August 2014. The superseding 2016 ruling rejects the use of the term "credibility," because "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p. However, in terms of the evaluation of symptoms, both rulings direct ALJs to consider all evidence in the record, and both incorporate the factors to be considered under regulations 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). As applied to this case, the rescission of SSR 96-7p would not appear to have any practical effect on the outcome. Under either ruling, an ALJ must point to specific reasons for the weight given to a plaintiff's subjective complaints. Many courts have chosen to apply this ruling retroactively because it clarifies rather than changes the administrative interpretation of the rules. *See, e.g.*, *Mendenhall v. Colvin*, 2016 WL 4250214, at *3 (C.D. Ill. Aug. 10, 2016); *Vonderau v. Colvin*, 2016 WL 4435620, at *5, n. 2 (N.D. Ind. Aug. 23, 2016). However, because SSR 16-3p does not alter the rule that the ALJ must provide specific reasons for the weight accorded a plaintiff's subjective complaints, this court need not reach the issue of whether it applies retroactively.

Regarding plaintiff's back pain, the ALJ noted that, while plaintiff told her orthopedist, Dr. Williams, she had mild pain throughout her life and was diagnosed with lumbago with sciatica, on examination Dr. Williams found plaintiff had "full forward flexion, full extension, and full lateral bending…no tenderness to palpation and no muscle spasm . . . [and a] negative straight leg raising test." (Tr. 16, 404-08). The ALJ noted Dr. Williams' conclusion that plaintiff had "back pain with no objective abnormalities" and that in the doctor's opinion "there was nothing on the MRI or on her examination that would account for [plaintiff's] back pain." (Tr. 16, 404, 407). The ALJ observed Dr. Williams recommended that plaintiff "diet and exercise 'and do[] a job where she does something 8 hours a day instead of sitting around and eating.'" (Tr. 16, 407).

Concerning plaintiff's heart problems, the ALJ noted that, when plaintiff went to the emergency room in May 2013 because of complaints of frequent palpitations and intermittent chest pain, plaintiff "rated her pain as 7/10 but was observed giggling and joking with her husband and the nurse while being examined." (Tr. 16-17, 280-81). Plaintiff was discharged because there was no diagnosis after many tests, but she was referred to a cardiologist. (Tr. 17, 279). The ALJ noted that the cardiologist, Dr. Amin, "treated her as if she had diastolic congestive heart failure, without specifically diagnosing that condition" at an appointment in January 2014. (Tr. 17, 399-403). Tests demonstrated plaintiff had normal valves, diastolic function, and chamber sizes. (Tr. 17, 427-31). An echocardiogram was normal. (Tr. 17, 429). The ALJ also noted that plaintiff's atypical chest pain had improved and been resolved. (Tr. 17, 427-28). The ALJ took note of the multiple factors that Dr. Amin recognized would cause plaintiff's shortness of breath, including asthma, possible obstructive sleep apnea, restrictive lung disease, and that she was "physically deconditioned and morbidly obese." (Tr. 17, 428). The ALJ pointed to evidence in the record that both plaintiff's blood pressure and hypertension "were well controlled." (Tr. 17, 428).

The ALJ noted that plaintiff's asthma problems are being treated by her primary care physician, Dr. Richards, who prescribed multiple medications, including inhalers.

Plaintiff's symptoms, such as shortness of breath, are generally well-controlled with her medications. (Tr. 17, 43, 335). While she still experiences occasional wheezing, her asthma and allergies have not led to her being hospitalized. *Id.*

After noting the above findings, the ALJ found that plaintiff "has not made a very persuasive case that she is unable to engage in competitive employment." (Tr. 17). While the ALJ recognized plaintiff's multiple impairments, she found that plaintiff "seem[ed] to exaggerate her symptoms." (Tr. 17). The ALJ found that the objective medical evidence demonstrated that plaintiff's back impairment was mild and that plaintiff's asthma was well-controlled with her medications. (Tr. 17, 43, 335). Another inconsistency noted by the ALJ was that the objective testing plaintiff had undergone demonstrated her doctor was treating her for a heart condition that she did not have. (Tr. 17, 399-403).

Importantly, the ALJ noted that plaintiff's "shortness of breath appears to be caused by a combination of these conditions and her weight," and "her doctors have advised her to lose weight and get more exercise to improve her health." (Tr. 17, 319, 368, 400, 403, 407). The ALJ recognized that at least part of plaintiff's inability to do certain work activities, such as climbing stairs, walking, and remaining seated, is from her morbid obesity, and the ALJ could not say "that she has been compliant with her physician's recommendation since the alleged onset date." (Tr. 17). The ALJ therefore concluded that plaintiff's testimony about her limitations was not entirely credible, specifically noting that one doctor "has gone so far as to say that she can work, and should work, instead of just sit around." (Tr. 17, 407).

Therefore, when determining plaintiff's RFC, the ALJ gave great weight to the treating source opinion of Dr. Richards, who recommended "that [plaintiff] needs to perform sedentary work, with only occasional/lifting and carrying of 10 pounds maximum and with a sit/stand option." (Tr. 17, 345-46). Additionally, the ALJ gave

some weight to Dr. Amin's opinion that plaintiff "is capable of engaging in work activities." (Tr. 17).[6]

The ALJ then considered written, unsworn answers from a VE to determine whether there were jobs in the local and national economy that plaintiff could perform, even though she was unable to perform any of her PRW. (Tr. 18). According to the VE, there were at least three unskilled occupations in the national economy at the sedentary exertional level that plaintiff could perform: final assembler; optical semiconductor bonder; and taper. (Tr. 19, 224-25).

Ultimately, the ALJ determined that plaintiff was not disabled under the Act. (Tr. 19).

## II.   DISCUSSION

Plaintiff argues that the ALJ's decision was not supported by substantial evidence. Specifically she argues: (1) the RFC finding is not supported by, but is inconsistent with, the medical evidence; (2) the ALJ inadequately considered plaintiff's morbid obesity; (3) her morbid obesity is equivalent to a medically listed impairment; and (3) the

---

[6] Dr. Amin's report indicated that while plaintiff is morbidly obese and physically deconditioned due to her morbid obesity, he advised her to exercise lightly daily. (Tr. 427-28). Dr. Amin's report did not state that plaintiff is capable of engaging in work activities, as suggested by the ALJ's decision, but the ALJ's determination of plaintiff's RFC, with "some weight" given to Dr. Amin's report, is not inconsistent with Dr. Amin's advice to exercise lightly daily as opposed to plaintiff being able to perform work activities. (Tr. 17). In an analogous Eighth Circuit opinion, an ALJ misread the word "walk" to be "work," but the court found the error was harmless because "there was no indication that the ALJ would have decided differently had he read the hand-written note" accurately. *Van Vickle v. Astrue,* 539 F.3d 825, 830 (8th Cir. 2008); *see also Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007). Similarly, Dr. Amin's recommendation to exercise lightly daily is consistent with the ALJ's final RFC determination, regardless of the ALJ's error in reading Dr. Amin's report, as the ALJ determined plaintiff had "the RFC to perform sedentary work… except that she can sit for approximately 15 minutes at a time before standing briefly." (Tr. 15). Therefore, the error is harmless.

hypothetical question posed to the vocational expert did not adequately capture the concrete consequences of plaintiff's impairments.

## A.   Standard of Review and Statutory Framework

Under 42 U.S.C. § 405(g), an individual may obtain judicial review of the final decision of the Commissioner of Social Security.  When reviewing this decision, the court must uphold the final decision of the Commissioner "if it is supported by substantial evidence on the record as a whole."  *Locker v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992).  The decision cannot be reversed "merely because substantial evidence would have supported an opposite decision."  *Baker v. Heckler*, 730 F. 2d 1147, 1150 (8th Cir. 1984).

A person is disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

In order to determine whether a plaintiff is disabled under the Act, the Commissioner has established a five-step sequential evaluation.  20 C.F.R. § 404.1520. At Step One, the Commissioner must determine if the plaintiff is participating in SGA, and, if she is, benefits are denied.  If the plaintiff is not engaging in SGA, the Commissioner must in Step Two determine whether she has a medically determinable impairment or combination thereof that is "severe."  20 C.F.R. § 404.1520(c).  If an impairment or combination thereof does not significantly limit a plaintiff's physical or mental ability to do basic work activities, the impairment or combination thereof is considered not severe.  20 C.F.R. § 404.1521(a).  In this case, the Commissioner determined that plaintiff suffers from four severe impairments.  Moving to Step Three, the Commissioner determines if the severe impairment or combination thereof meets or is medically equivalent to the criteria of a listed impairment in C.F.R. Part 404, Subpart P, Appendix 1.  If plaintiff's impairments or combination thereof meet or are medically

equivalent to a listed impairment, the plaintiff is determined to be disabled.  If not, the Commissioner moves on to Step Four.  In this case, the Commissioner answered the Step Three issue in the negative.

At Step Four, in order to determine if the plaintiff can do her PRW, the Commissioner must determine her RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).  When determining RFC, the Commissioner must consider all relevant medical and other evidence, including medical reports, examinations, and descriptions and observations of the limitations by both the plaintiff and others such as family or friends.  20 C.F.R. § 404.1545(a)(3).  Once the Commissioner has determined plaintiff's RFC, she must use that to determine if the plaintiff is able to perform PRW.  If the plaintiff cannot return to her PRW then the Commissioner moves on to Step Five.  In this case, the Commissioner determined that plaintiff cannot perform her PRW.

Thus, the burden shifted to the Commissioner at Step Five to establish that regardless of the plaintiff's impairments, she has the RFC to perform SGA in the national economy that is consistent with her other vocational factors, such as age, education and work experience.  *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (citing *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  If the Commissioner correctly meets that burden, then the plaintiff is not disabled.  42 U.S.C. § 423(d)(2)(A).  That is the cardinal issue now before the court.

## B.  <u>RFC Calculation</u>

Plaintiff first argues that the RFC finding that she could stand and sit intermittently for 15 minutes without losing focus was not supported by any medical evidence.  (ECF No. 16 at 10).  When determining a plaintiff's RFC, the Commissioner must consider all of the plaintiff's mental and physical impairments.  *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001).  While the Commissioner makes the RFC determination based on all of the relevant evidence, "the record must include some medical evidence that supports the ALJ's residual functional capacity finding."  *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000).

Plaintiff had the burden of demonstrating she would not have been able to stay on task while repositioning herself. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Nowhere in the initial claim for disability benefits or in the medical record is there any evidence or allegation that plaintiff suffered from attention problems. In her decision, the ALJ noted that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . [and] also considered opinion evidence." (Tr. 15-17). Plaintiff did not testify that she had problems with attention at the hearing. (Tr. 26-53).

Additionally, plaintiff did not complain of attention difficulties at any of her medical appointments. (Tr. 258-59, 261, 280, 305, 317, 334, 371, 378, 397, 400, 428). Several physicians examined and reported on plaintiff's psychiatric health, and besides a few notations of depressive symptoms, those reports indicated normal affect, mood, and behavior. (Tr. 258-59, 261, 280, 305, 317, 334, 371, 378, 397, 400, 428). The ALJ is entitled to consider the lack of pertinent psychological symptoms noted by physicians when determining plaintiff's RFC when considered as part of the medical record as a whole. *Frank v. Colvin*, 129 F. Supp. 3d 794, 808-12 (E.D. Mo. 2015) (recounting the medical record that did not support disability indicated by mental impairments). Similarly, "an absence of evidence of ongoing counseling or psychiatric treatment or deterioration or change in claimant's mental capabilities disfavors a finding of disability." *Id.* at 808-09. Plaintiff did not report difficulty with or receiving treatment for any attention problems and, thus, the ALJ lawfully included an ability to concentrate in the RFC.

In addition to the medical evidence from plaintiff's physicians, the ALJ relied on the opinion of a State agency consultant. (Tr. 15, 65). This consultant determined that the claimant does not suffer from any medically determinable mental impairment. (Tr. 15, 65). The ALJ was entitled to rely on the State agency consultant's opinion. 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i); *Colvin*, 129 F. Supp. 3d at 809. Therefore, the lack of findings of attention difficulties when psychological symptoms were examined by several physicians, as well as the opinion of the State agency consultant,

constitute substantial evidence for the ALJ's RFC determination that plaintiff would be able to "remain on task while repositioning" during her sit/stand intervals. (Tr. 15).

## C.    Credibility Determination

Plaintiff also argues that the ALJ improperly discredited her subjective statements, because "a treating source's statement that an individual 'should' lose weight or has 'been advised' to get more exercise is not prescribed treatment." SSR 02-1P. Plaintiff argues that, even if the recommendations of the doctors were considered prescribed treatment, the Commissioner "will rarely use 'failure to follow prescribed treatment' for obesity to deny or cease benefits." *Id.* This is true, because the causes of obesity and how to effectively treat it are not well known, and thus it is difficult to say that the prescribed treatment of losing weight "is clearly expected to restore the ability to engage in substantial gainful activity." *Id.* However, plaintiff's inability to lose weight was not the only reason the ALJ discredited her subjective statements regarding the intensity, persistence, and limiting effects of her symptoms. (Tr. 15-17).

Any questions regarding the credibility of a plaintiff's statements are "primarily for the ALJ to decide, not the courts." *See Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003). Where the "individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record." SSR 96-7P. Here, the ALJ noted many occasions where plaintiff's statements regarding her symptoms were not substantiated by the objective medical evidence. (Tr. 16-18). The ALJ noted that plaintiff saw a doctor in August 2012 complaining of back pain, but when she was seen by an orthopedist in April 2013 the orthopedist noted there were "no objective abnormalities" associated with plaintiff's back pain. (Tr. 16, 404). "In his opinion, there was nothing on the MRI or on her examination that would account for the claimant's back pain." (Tr. 16, 407).

Additionally, plaintiff's subjective statements regarding her other impairments are not substantiated by objective medical evidence. Plaintiff was sent to the emergency room on May 13, 2013, but her tests showed no objective medical diagnosis for her

complaints of frequent palpitations and intermittent chest pain. (Tr. 16, 279). At follow-up appointments for her heart problems, her doctor treated her as if she had diastolic congestive heart failure "without specifically diagnosing that condition." (Tr. 17, 399-403) (on March 6, 2013, her cardiovascular system was considered normal). Her tests came back normal and plaintiff's palpitations and atypical chest pain had been resolved. (Tr. 17, 399-403, 427-28). The ALJ also noted that plaintiff's breathing problems were relieved by medications. (Tr. 17, 43, 335).

While the ALJ noted the above examples of the objective medical evidence not supporting plaintiff's subjective complaints, "allegations concerning the intensity and persistence of pain and other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7P. However, the ALJ did not just rely on the inconsistency of plaintiff's subjective allegations and the objective medical evidence. The ALJ specifically noted that several doctors stated plaintiff was not only capable of working, but should in fact engage in such activities to improve her health. (Tr. 17, 319, 345, 398, 400, 407, 428).

The ALJ is permitted to consider "statements and reports . . . from treating or examining physicians . . . concerning the individual's symptoms and how the symptoms affect the individual's ability to work." SSR 96-7P. Additionally, the ALJ noted that several of plaintiff's physicians advised her to get more exercise and not just sit around, suggesting that plaintiff not only is capable of the kinds of work recommended by the physicians and the VE but in fact should be more active in order to improve her health. (Tr. 17, 319, 345, 398, 400, 407, 428).

The ALJ is also permitted to analyze the consistency of plaintiff's statements regarding her pain and symptoms by comparing those statements with "other information in the case record, including reports and observations by other persons." SSR 96-7P. For example, when plaintiff was sent to the emergency room on May 13, 2013, the ALJ noted "she rated her pain as 7/10 but was observed giggling and joking with her husband and the nurse while being examined." (Tr. 16-17, 280-81). Thus, the ALJ properly

recognized the inconsistency between plaintiff's statements and others' observations in her credibility analysis.

Importantly, the ALJ is not required to consider all of the credibility factors when making credibility determinations. *Samons v. Astrue*, 497 F.3d 813, 820 (8th Cir. 2007). Among the *Polaski* factors to be considered are any functional restrictions given to plaintiff. *Id.* Plaintiff's treating physicians and other physicians listed her functional restrictions as sitting and standing *while working* and did not restrict her *from* working. This is substantial evidence, in addition to the inconsistency of plaintiff's statements and the objective medical evidence, to discredit plaintiff's statements. (Tr. 15-17, 345-46, 407, 427-28).

Therefore, the ALJ lawfully discredited plaintiff's subjective statements regarding the intensity, persistence and limiting effects of her impairments or combination thereof while including the limitations she found credible in her RFC determination. (Tr. 15-19).

**D.    Medical Listing**

Plaintiff argues her morbid obesity is equivalent to a listed medical impairment. (ECF No. 16 at 13). The Commissioner can find that obesity, in combination with other impairments, may be sufficient to equal a medical listing. SSR 02-1P. The Commissioner "*may* also find that obesity, by itself, is medically equivalent to a listed impairment." *Id.* (emphasis added). However, the Commissioner "will not make assumptions about the severity or functional effects of obesity combined with other impairments," but "will evaluate each case based on the information in the case record." SSR 02-1P.

Plaintiff does not cite specific evidence that obesity alone or in combination with her other impairments is medically equivalent to a listing. Rather, plaintiff lists circumstances in which the Commissioner could find obesity medically equivalent to a listing, such as when obesity causes a plaintiff to be unable to walk effectively or, when in combination with obesity, other impairments of the respiratory or cardiovascular systems are so severe they are medically equal to a medical listing. In this case, plaintiff

is able to walk effectively. (Tr. 44-45). Additionally, while she is "deconditioned" by obesity, the effect of her obesity on her other impairments does not make them severe enough to meet a medical listing. (Tr. 428). Several physicians have found, with knowledge of her obesity, asthma, and heart problems, that plaintiff not only can increase activity levels but should do so. (Tr. 17, 319, 368, 400, 403, 407). Substantial evidence supports the ALJ's decision that plaintiff's obesity was not medically equivalent to a listing.

E.    **VE Opinion information**

Lastly, plaintiff argues the hypothetical situation presented to the VE did not capture the concrete consequences of her impairments. (ECF No. 16 at 16). In order for a hypothetical question to serve as substantial evidence, the question must entirely describe the plaintiff's individual impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) ("Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision"). However, the hypothetical question presented to the VE need not use specific diagnostic terms. *Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001). The ALJ is only required to include in the hypothetical question those impairments and restrictions she found credible, and she can exclude complaints of pain when those complaints are determined not to be credible. *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005).

Here, the ALJ did not include the word "obesity" or lay out the symptoms thereof in the hypothetical questions. However, the ALJ included in the hypothetical questioning the concrete consequences of plaintiff's impairments she ultimately determined for plaintiff's RFC. (Tr. 224); *Wright v. Colvin*, No. 13-3224-CV-S-ODS, 2014 WL 3361817, at *3 (W.D. Mo. July 9, 2014) (unpublished). The ALJ asked if such a person could "perform any unskilled occupations with jobs that exist in the national economy." (Tr. 225). To that the VE responded in the affirmative, and listed three different jobs the hypothetical person could perform. (*Id.*).

Even without an explicit inclusion of plaintiff's obesity in the RFC in a hypothetical posed to a VE, the Eighth Circuit has determined there is no error when "[n]othing in [the claimant's] medical records indicates that a physician ever placed physical limitations on [her] ability to perform work-related functions because of her obesity." *McNamara v. Astrue*, 590 F.3d 607, 611 (8th Cir. 2010).[7] *See also Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) (holding that even when physicians have recognized a claimant is obese and urged him to lose weight, there was no error in omitting obesity in a hypothetical question when those physicians did not impose "any additional work-related limitations" because of the obesity, and when the plaintiff himself "did not testify that that his obesity imposed any additional restrictions"). The Eighth Circuit has also noted the significance of a claimant's doctors diagnosing and attempting to treat claimant's obesity while still believing claimant could perform light work as strong support for the omission of obesity in hypothetical questions. *Forte*, 377 F.3d at 897.

Here, as in *McNamara* and *Forte*, plaintiff's physicians recognized her obesity and recommended she lose weight, but still recommended she become more active and

---

[7] A contrary Eighth Circuit case is inapposite here. In *Morrison v. Apfel*, the Eighth Circuit found error when an ALJ failed to include the fact that the claimant was obese in the hypothetical questions to the VE, because the plaintiff was only 16 pounds away from meeting the listing requirement. 146 F.3d 625, 628–29 (8th Cir. 1998). However, this case was decided when obesity itself was a listing with enumerated requirements (such as the weight limit factoring into the court's analysis in *Morrison*). The Social Security Administration removed obesity as a listing in 1999, because "our experience adjudicating cases under this listing indicated that the criteria in the listing were not appropriate indicators of listing-level severity. In our experience, the criteria in [that listing] did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity." SSR 02-1p (citing Revised Medical Criteria for Determination of Disability, Endocrine System and Related Criteria, 64 Fed. Reg. 46122 (Aug. 24, 1999)). The Eighth Circuit's present case law is concerned with whether the ALJ has addressed medical evidence that a claimant's obesity causes work-related limitations. *See McNamara*, 590 F.3d at 611–12; *Forte*, 377 F.3d at 896-97.

engage in work activities. (Tr. 319, 345-46, 368, 400, 403, 407, 427-28). *See also McNamara,* 590 F.3d at 611; *Forte*, 377 F.3d at 896-97. Thus, the ALJ was not required to include the word "obesity" in the hypothetical posed to the VE, because the functional limitations and concrete consequences of plaintiff's obesity were laid out in the RFC and the hypothetical questioning.

As the hypothetical posed to the VE was proper, the VE's opinions are substantial evidence that plaintiff is able to perform jobs that exist in significant numbers in the national economy. Plaintiff is therefore not disabled. The decision of the Commissioner is affirmed.

An appropriate Judgment Order is issued herewith.


        S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on March 17, 2017.